OPINION OF THE COURT
Edward J. Greenfield, J.
This action for breach of contract, conversion and violation *927 of fiduciary obligations centers on the interpretation of a mortgage participation agreement between plaintiff Camala Co. (Camala) and defendant Plantsville Inc. (Plantsville). Under the agreement, Plantsville was to administer the mortgage and receive monthly payments from the mortgagor, but regardless of the amount collected, Camala was to receive 7% of the principal in monthly installments.
Plantsville has made payments to Camala which it contends have fully retired the principal amount owing to Camala, and thus asserts that plaintiff has been paid in full. Plaintiff contends that the sums received were interest payments, so that there is still a debt outstanding of $326,488.15. Camala has also sued Plantsville’s parent company, Inland Credit Corporation (Inland), and Stanley Stern, the president and principal of both corporations. Both sides move for summary judgment.
Since the governing agreement does not itself specify with total clarity whether the payments made by Plantsville to Camala were to be credited to principal or interest, a view of the underlying facts and extrinsic circumstances is necessary to elucidate what the intention of the parties must have been.
The facts are these: in 1976, Camala’s predecessor in interest, Alamac Estates Inc., was the owner of an apartment building at 2056 Broadway, near 72nd Street in the City of New York. There was a first mortgage on the property held by Lincoln Savings Bank with a balance of $1,437,422. A balloon balance was to come due in 1982. Alamac was also indebted to Inland, and to secure that debt gave Inland a second mortgage for $1,050,000. The value of the equity remaining to Alamac was $542,500.
Alamac agreed to transfer title to the property to Inland’s subsidiary, Plantsville, and Alamac was given a mortgage in exchange for relinquishing its equity interest.
The amounts owed to Inland and to Alamac, totaling $1,592,500, were combined in a consolidated mortgage. This transaction was obviously effectuated for the purposes of securing the debt owed by Alamac, and to relieve Alamac of the obligation of paying any further interest. It assured Ala-mac that its equity would not be lost in a foreclosure proceeding, because the payments to Lincoln and Inland would be assumed by Plantsville. The consolidated mortgage was to be “payable on demand, with interest at the rate of lYi percent a year”, and subordinated to the Lincoln first mortgage. All *928 rents received by Plantsville, after payment of interest and amortization to Lincoln, were to be paid over to Inland, and Inland was to divide the amounts received with Alamac in proportion to their respective interests. Inland was to be paid its share of the amortization and its 7ti% interest in full before any balance was payable to Alamac. The rent on the premises was payable by South Pierre Associates, the net-lessee, which had the option of purchasing the property for $3,000,000.
In 1978, South Pierre exercised its option to buy the building from Plantsville and a new mortgage arrangement was worked out. The new mortgage between South Pierre Associates and Plantsville as the sole parties, was denominated the "wrap-around mortgage.” By this time, Alamac had somehow been transmuted into Camala. Camala was not involved in the negotiations for the wrap-around mortgage, and was not a party thereto. South Pierre was to make its mortgage payments to Plantsville and Plantsville was to take care of payments to Lincoln on the first mortgage and under the consolidated mortgage. Camala’s consent to the wrap-around was not required. The Lincoln’s first mortgage was to become due in November of 1982, and Plantsville was given the option of extending or replacing that mortgage. South Pierre specified that "the monthly installments to principal and interest under any such extended or replacement mortgage shall be no greater than the monthly installment due under the prior mortgage [the Lincoln mortgage]”. This was an assurance running only to South Pierre and not to Camala.
In connection with the 1978 changes, there was a new mortgage participation agreement which superseded the terms of the consolidated mortgage. Under the mortgage participation agreement, Inland surrendered its priority positions vis-ávis Camala, and agreed to distribute the cash flow after the payments to Lincoln in proportion to the respective shares of Inland and Camala. In the event that there was insufficient cash flow, Plantsville agreed to pay to Camala each month nevertheless "an amount equal to not less than seven [7%] percent of Camala’s then share of the Aggregate Principal divided by 12.”
By November of 1982, interest rates had climbed to a marked degree. It appears that no bank or other financial institution would refinance the Lincoln first mortgage except at rates which would necessitate payments in excess of the ceiling agreed upon with South Pierre. If the Lincoln mort *929 gage were not paid when due, all parties would be confronted with a foreclosure. Thereupon, defendant Stanley Stern, the president of both Inland and Plantsville, agreed to step in as first mortgagee, with interest payable on the new first mortgage at 13Vfc%, which was less than the going bank rate. Although there was no cash flow left over for Plantsville after making the first mortgage payments, Plantsville commenced paying from its own funds monthly installments to Camala based on the agreed 7% annual return.
From November 1982 on, Plantsville sent its own checks to Camala in sums which diminished monthly. A quick perusal indicates that the first payment was 7% of the principal balance owed to Camala, and that each monthly payment reduced that principal balance, with the next 7% payment being calculated on the reduced balance. Thus, the monthly payments were steadily reduced from $2,581.70 for November 1982 to $2,079.20 in December of 1985. The reduction of the principal balance by V12 of 7% each month, according to Plantsville’s calculations, reduced the balance owing to Camala from $442,577.27 to $354,355.08.
On August 23, 1983, Camala wrote to Plantsville that it was being underpaid (because if the payments represented 7% interest only, the principal would have been unchanged and the monthly checks would not be constantly reduced). On October 11, October 18 and December 16, 1983, Camala again objected that the monthly payments were inadequate. The attorney for Plantsville replied on January 24, 1984 explaining that there was insufficient cash flow for distribution to either Plantsville or Camala, but in accordance with the participation agreement, Camala was continuing to receive a 7% return of its investment. Plantsville continued to make the diminishing monthly payments, which Camala thereafter accepted without further objection or any indication that the checks were being received under protest or in partial payment.
South Pierre, the mortgagor, prepaid the entire sum due on the wrap-around mortgage by February of 1987. Plantsville thereafter tendered to Camala a sum representing its calculation of the outstanding principal as reduced by the monthly payments, and this payment was accepted by Camala.
A review of the foregoing facts leads inescapably to certain conclusions. The first and most obvious is that there is no basis for any cause of action against defendants Inland and *930 Stern. Defendant Inland is the subject of the third, fourth and fifth causes of action. The third cause of action alleges that Inland breached its obligations to Camala under the participation agreement by "failing to assure that Plantsville would fully perform its obligations.” The fourth cause of action alleges that Inland failed to pay the full amount of Camala’s share plus accrued interest on the wrap-around mortgage, although the obligation of payment was that of Plantsville. Although Camala claims in the ad damnum to be entitled to damages from Inland for the fifth cause of action, that cause of action of the amended complaint is asserted only against Plantsville. In any event, there is no basis for alleging that a failure to pay the full amount of the note allegedly due constituted a conversion by anyone.
Under the wrap-around mortgage and the mortgage participation agreement of 1978, Inland had no obligations running to Camala. Camala was not a third-party beneficiary under the wrap-around mortgage. It is clear that the mortgage was an agreement between South Pierre and Plantsville, and there is nothing contained therein to spell out any obligation running from Inland to Camala.
Three of the causes of action (8, 9 and 10) are asserted against defendant Stanley Stern. The eighth cause of action alleges that Stern breached a fiduciary duty to Camala to keep it fully apprised and to avoid taking actions that would promote his self-interest to the detriment of Camala.
The ninth and tenth causes of action allege that Stern caused Plantsville to wrongfully convert and retain property of Camala. This cause of action is likewise insufficient. Defendant Stern was an individual who acted through corporations he controlled. He individually had no contractual relationship with Camala. Unless there was demonstrable fraud which would justify the piercing of the corporate veil, there is no reason why corporate actions (even if he helped make them) would give rise to personal liability.
Insofar as the alleged breach of fiduciary relationship is concerned, it is clear that there was none. Under the mortgage participation agreement between Plantsville and Camala, Plantsville had the right to extend, modify or satisfy the first mortgage, provided that it did not diminish the security of Camala. It was contemplated that the Lincoln first mortgage would be refinanced, and if there was no prohibition on Camala or its sister company taking over the first mortgage, *931 there would be no prohibition against the president of those companies doing so individually. It is clear that far from operating through self-dealing, defendant Stern, by taking over the first mortgage personally at a 13Vi% interest rate, which was well below the going commercial rate at the time, was getting no benefit for himself. Rather, he was preserving the situation and maintaining Camala’s equity position by investing over $1,200,000 of his own money. Even though there was no longer sufficient cash flow from South Pierre to cover payments for both Plantsville and Camala. Camala had a guarantee and continued to receive payments from Plants-ville. There is no basis for any claim of any breach of fiduciary obligation owing by Stern to Camala.
That leaves for determination the question of whether Camala’s share has been fully paid by Plantsville. The first cause of action alleges that Plantsville has failed to pay the outstanding balance it admitted to be due upon prepayment of the wrap-around mortgage. Since that sum has now been paid, that cause of action is moot.
The second cause of action alleges that Plantsville breached the mortgage participation agreement by failing to pay Camala’s share of principal and interest. The fifth and sixth causes of action allege that Camala’s property had been converted. The seventh cause of action alleges that Plantsville breached its fiduciary duty to Camala as its agent. Camala also asks for punitive damages and attorneys’ fees.
It is clear that in a commercial dispute such as this, there is no basis for the collection of punitive damages or attorneys’ fees. While Plantsville was the agent for Camala under the mortgage participation agreement, there is no showing of a breach of fiduciary duty. Camala’s consent was not required under the consolidated mortgage and share agreement, so that it could properly be superseded by the wrap-around mortgage. Its consent was not required for the sale to South Pierre, and its consent was not required for the retirement or refinancing of the Lincoln first mortgage, nor was its consent required for accepting prepayment of the wrap-around by South Pierre. It was apprised of these changes, and under the mortgage participation agreement it. was given greater rights than it theretofore had. As discussed above, there was no impropriety demonstrated in having Stern, Plantsville’s president, take over the first mortgage to his economic detriment in order to stave off a foreclosure.
*932 With respect to the nature of the payments which were made by Plantsville, the mortgage participation agreement specifies monthly installments based upon 7% "of Camala’s then share of the Aggregate Principal.” It does not call for the payment of a 7% interest rate, although in all the preceding and associated documents, it is clear that the parties knew how to specify "principal and interest” when they saw fit to do so. The consolidated mortgage specified "interest at the rate of IV2 percent”, as contrasted with the provision here for payment of 7% of the principal. "[T]he obligation to pay interest on an indebtedness must be expressed or implied in fact, or else it does not exist. It is not implied as a matter of law under general principles of law.” (New York State Thruway Auth. v Hurd, 25 NY2d 150, 158.) However, when advances have been made to a commercial firm, in the absence of some agreement to the contrary, interest is presumed. (Rodgers v Clement, 162 NY 422, 425.)
Here, however, it was not Camala which had made advances to Plantsville — just the reverse. Camala was being relieved of its own obligation to pay interest, and was given guarantees that its original equity position or what was left of it would be preserved. If Inland and Plantsville were ready to forego the interest on their much larger and originally senior share of the indebtedness, there is no reason to conclude in the context of these transactions that Camala was to receive more favorable treatment and be paid interest by Plantsville whether the payments by the mortgagor sufficed to cover such interest or not.
The entire transaction had been structured to protect Inland on its loans to Alamac, Camala’s predecessor, which were in excess of $1,000,000. Camala’s share of the wrap-around mortgage did not represent a loan in a commercial context and there was no agreement that Camala was to continue receiving interest while Plantsville received nothing. The only language specified was that Camala was to receive at least 7 % of its "then share of the Aggregate Principal.” Use of the term its "then share” indicates the parties contemplated that the amount of the principal outstanding would be reduced.
In fact, that that was the practice is indicated by the course of conduct by the parties. The monthly payments made by Plantsville to Camala represented exactly 7% of the outstanding principal balance, and each month, as the principal balance was reduced, the 7% payment was reduced accordingly. While Camala originally protested that it was not getting the *933 full payment, after the letter of explanation in January 1984, it ceased its protests and accepted each diminishing monthly payment without any reservation of rights. While this may not have technically been an accord and satisfaction, it is illustrative of a course of conduct which tends to spell out the understanding of the parties. (Cf., Frouge Corp. v Chase Manhattan Bank [Natl. Assn.], 426 F Supp 794, 797.)
Both sides having moved for summary judgment and having indicated there are, indeed, no disputed facts — the only dispute being the proper inferences and conclusions of law to be drawn from those facts — the court concludes that summary judgment dismissing the complaint must be awarded to the defendants. There is no basis for liability asserted against defendants Inland and Stern, and the sums defendant Plants-ville was obligated to pay to Camala had been paid in full.
In view of the foregoing, that portion of plaintiffs application seeking discovery is denied as moot.